Thank you, Your Honor. May it please the Court, my name is Steven Benedetto and I represent David Saccoccio, the appellant in this matter. This appeal concerns the proper application of Rule 56 in an excessive force context. On May 31st, Officer Eric Gomez fired a 40-millimeter impact projectile round at David Saccoccio, struck him in the forearm, fractured his forearm, and that injury ultimately required corrective surgery. Those facts are not in dispute. It's also not in dispute that Mr. Saccoccio was not posing a threat to police. Despite that, the district court found that the use of force was minimal to moderate, despite the injury, despite the nature of the round, and despite the fact that Officer Gomez fired the round from approximately 100 feet away, at night, in the dark, against a moving target. The fundamental error that occurred at the district court was the determination and the classification of that use of force as minimal to moderate. The prior case law of this Court, including but not limited to the Dwele case, Dwele v. Rutherford, as well as Nelson v. City of Davis, establishes that that use of force is intermediate use of force, use of force that is more than minimal and may constitute deadly force, but not necessarily. In this case, the nature of the shooting did reach that level, and the Court took that issue out of the jurors' hands improperly on summary judgment. When viewing a case like this, where the fundamental claim is excessive force, do we take into consideration the result of the use of that force? In other words, the various serious injuries that your client sustained? Is that part of the equation? It is, Your Honor. Under the ---- What case supports that? Filarca v. Birgeneau, as well as the case that the district court itself cited. Filarca v. Birgeneau is 891 Federal 3rd 809, and the district court itself noted that the impact of the injury under the Santos case can relate back to and ultimately inform the level of the force that was used in the classification of that force. Go ahead. So ultimately, it simply restates common sense that if a projectile causes a serious bodily injury, an officer ex post facto cannot say the projectile was incapable of causing that injury. Clearly, it caused that. And the district court noted there is no dispute about causation in this case. It's a projectile. I know this is hypothetical, but if the projectile had missed your client entirely, would it still be the use of excessive force? I don't believe so, Your Honor, because I believe, at least when it comes to shooting lethal munitions, firing bullets at any of those ---- My question assumes that the officer was intending to have the projectile hit your client. But for the purpose of the hypothetical, let's assume that his aim wasn't good and he missed. And I think Ninth Circuit case law does require an actual impact to state an excessive force claim. Having said that, your question highlights another issue, which is the officer's subjective intent in terms of where they're aiming at does not necessarily inform the classification of the force actually used. When the force used is analyzed under Graham, we're looking at a risk assessment. What are the possible outcomes here? And the way Officer Gomez was trained and the way this weapon was designed is that the projectile is supposed to be shot from at least 5 feet, no more than 150 feet. The further the projectile is shot from, the less reliable it is. Of course, when you're dealing with a moving target, you're dealing with shooting at night, there's variables in there. And when the manufacturer of this weapon system instructs and the officers are trained that this weapon can actually be fatal if it strikes someone in the face, if it strikes them in the head, if it strikes them in the spine, then we're looking at a risk assessment of the use of the weapon that's significant. And if we go back to the Nelson v. City of Davis case, what we see is an officer that shot a student in the eye with a pepper ball. That was not intentional. The officer was not aiming for the student's eye. The officer was attempting to shoot the pepper ball at the student, possibly even at the student's feet, and use the weapon properly. But this Court, the Ninth Amendment use of force was excessive because it was a known risk, that if it did strike a suspect in the face, it could cause a serious injury. It's your best case for the idea that the shooting violated Saccascio's Fourth Amendment rights? I think we have to kind of rely on analogous cases. This Court has never determined whether a 40-millimeter impact round constitutes excessive force. However, if we look certainly at the Nelson v. City of Davis case, Your Honor, what we see is a less volatile weapon system, a pepper ball system, that's not intended to create a traumatic impact to the body. It is solely But does. But does when it shot at somebody. And this weapon system is created, the testimony here and is undisputed, is intended to create a traumatic impact to the body. It's intended to create pain compliance and then deliver a load of O.C. tepisum spray. Your client was, this was what, one or two nights after the George Floyd murder? It was the fourth night after the murder, Your Honor. And your client, the governor of Arizona, issued a curfew? That's correct. And your client was out after the curfew? He was, Your Honor. No question but that he knew that? It's undisputed. In fact, I think in the video that the defense submitted, there's an acknowledgment that he was aware that it was after curfew. Okay. All right. Go ahead. Counsel, I just wanted to ask you, what effect does that have on our analysis of whether or not there was excessive force, the fact that he was out after curfew? Thank you for that, Your Honor, and that's exactly where I was headed. I think it's highly relevant because it goes to the Graham analysis of the severity of the crime. The curfew, as defined by Governor Ducey in 2020, was a misdemeanor violation. There's no allegation here and there's no evidence that Mr. Sicoccio was ever violent. There's no evidence. In fact, the evidentiary inferences are that he was not engaged in any type of riotous activity. The videos submitted by the defense show him walking through the streets, certainly after curfew, and violating that misdemeanor emergency order, but not engaged in any type of violent or threatening behavior. So under Graham, we're dealing with essentially a low-level misdemeanor that is akin to trespassing under Arizona law. We're dealing with a Class I misdemeanor. Trespassing, again, back to the Nelson v. City of Davis case, is not enough to justify more than a minimal use of force. And so that's where the violation of the emergency order ties in as with Graham. That also washed over, in this case, with respect to the court's qualified immunity analysis. That goes to the issue, of course, of whether this was clearly established. If we look back again, I think the Nelson case really is instructive. In Nelson and also in Duerle, the Ninth Circuit specifically advised and guided officers that this type of use of force, firing projectiles at nonviolent, nonthreatening subjects suspected only of misdemeanor violations, is excessive. And I think this officer had every reason to know that, given that those cases were 10 and 20 years old at the time of this shooting. I think that largely covers the points I intended to hit. If the panel has any additional questions I've not answered, I'm happy to field them. Otherwise, I'll reserve the rest of my time for rebuttal. All right. Thank you, counsel. Thank you. We'll hear from defendants. Good morning. May it please the court. My name is Lori Burke, and I represent the defendant at police, Eric Gomez, officer with the City of Phoenix Police Department. Let me correct a couple of things that Mr. Benedetto stated. One is that his client was a nonviolent, nonthreatening suspect. His conduct at the time of the use of force was threatening, not to the officer at that point in time. Officer Gomez's testimony was that when the air unit announced that a group that had been involved in the riot at 7th Street and Roosevelt was headed their way, they had broken off and were headed their way, running at the officers, Officer Gomez did fear for his safety and the safety of his fellow officers. Once Mr. Sococho and his other people who he was running with started to scale the wall, was running in the other direction, his concern then transitioned from concern for his own safety to concern for homeowners, and specifically in the neighborhood where Mr. Sococho was scaling the wall to a residential fence to get into a residential area. Over the four days of unprecedented civil unrest that Officer Gomez had worked in each day, he had seen and heard about individuals trying to break into people's homes, setting fires to structures, causing other damage, and he had serious concerns about the well-being of any residents whose home Mr. Sococho may intend to break into. And if you listen to the body-worn camera video for Officer Gomez from right after he used the force on Mr. Sococho, you can hear the air unit announce that there are three people trying to break into a house. So that corroborates the reasonableness of the concern that Officer Gomez had. And the Forrester case is clear that while Mr. Sococho was only suspected of committing misdemeanors at that time, including trespass, which notwithstanding that it's a misdemeanor, was serious in this — these days of the civil unrest, in the Forrester case, the Court rejected that argument, saying that even though many of the crimes were misdemeanors, the city's interest in preventing their widespread occurrence was significant. These are people who were out past the emergency curfew. And Mr. Benedetto directed you to Mr. Sococho's friend Rebecca's video. They're out boasting. They are trying to get other — they're agitating. They are trying to encourage other people, after curfew and violation of the law, to come down and meet with them and continue to march. And Mr. Sococho, according to the video, was involved in riotous activity. He was one of the people that was headed toward the freeway. They were trying to take over the freeway with the other rioters.  Are you saying that was what was happening at the point when he was shot with the beanbag? Was he approaching the freeway? Was that — No, that was when they had run — so Officer Gomez had been at that area. And then they drove away from that area and then pulled over that white truck that had the six occupants. And Officer Gomez was dealing with those six occupants when the Air Unit announced that that group that had broken off from the people at the 7th Street and Roosevelt were coming their way at them. So he was informed that they were part of that group. I'm sorry, Your Honor, go ahead. I was going to ask you, do you agree or disagree with the opposing counsel's argument that the district court mischaracterized the level of force that was used? No, not at all, Your Honor. And — Do you agree or disagree? I disagree with Mr. Benedetto. I agree with the court. So you think the court's use was minimal? Yes. If you take a look at the product specification, it's at ER-231. There is a box to the left that says warning. And it states, when used in accordance with CTS training guidelines — CTS is the manufacturer — and the individual agency's policy, they are intended to cause varying degrees of pain and injury which are temporary. And then it goes on to say, in rare circumstances, if used incorrectly, CTS less lethal products may cause damage to property, serious bodily injury, or death. Therefore, any person using the force option depicted on this page should receive proper training to ensure the safest and most effective use. And the improper use is shots to the head, neck, thorax, heart, or spine. That is it. Other than that, it is not intended to cause injury. It's not known to cause injury. We have cited to Sergeant McBride's declaration where he said he had never seen an injury beyond bruising from this. We have Lieutenant Moore's testimony who has — where he has personally been shot at a much closer distance than 100 feet, where he's only sustained bruising. And we have Officer Gomez's testimony where he had only seen bruising from this type of force. And so the court, in the district court's opinion, cited to the case law that states while the injury may be more severe than typical for this type of force, that does not transform defendant's use of force into something other than a single correctly deployed 40-millimeter O.C. impact around — impact round. So unanticipated injuries do not transform a reasonable use of force to an unreasonable use of force. How much — do we know how much time elapsed between the time that your client was advised that this group was moving away from the freeway and — and his encounter with Mr. Sekasho? It was very quick. And you can hear the radio transmissions on Officer Gomez's body-worn camera video. It was seconds. It was less than a minute. At any point in time, did Sekasho charge Officer Gomez? No. In fact, he was running away, right? Pardon me? He was running away. No. He was trying to get away. He was trying to flee the police, correct, which is another factor under Graham. So — But, counsel, let me ask you this. What do our cases say about when force can be used to subdue a fleeing suspect? Well, it was — it wasn't just to subdue a fleeing subject. It was also to prevent him from scaling the fence into a residential yard where he may harm occupants of a residence, you know, commit arson, that kind of thing. You have to look at the totality of the circumstances. What case most closely resembles this case that says it's not excessive force for an officer to inflict this type of damage on a suspect that's fleeing if there is a fear of further harm from that fleeing? What case are you relying upon to support that proposition? I'm relying on the whole body of case law. Now, you have to give me a specific case that if we wrote this — if we wrote this as a matter of law, what case would we cite to support that proposition? I would look to Graham versus Connor. Well, Graham asks us to look at all of the factors. Right, but under the specific facts of Graham, I think that that would be a reasonable conclusion as well. And if you look at this Court's decision in Puente versus City of Phoenix, 123 F. 4th, 1035, that — you don't have fleeing suspects there, but you do have use of beanbags where the Court was asked to find that the law was clearly established that the use of beanbags in that case constituted excessive force. And you — relying on the Nelson case, which plaintiff relies on, to say that the law was clearly established, that that was excessive force. And the Court distinguished the Nelson case in many different respects, and this case is more akin to the Puente case than — there's no — there are no similarities between Nelson and our case. You didn't have fleeing individuals. You had individuals who were at a party. It wasn't somebody who is engaged in civil unrest where an officer has been involved in civil unrest. The state's interest is significant in our case to stop Mr. Saccoccio. He's out past curfew. There's still riots going on in the area. And so they were told to arrest everyone. And if you look at all of the facts together, it was a reasonable use of force. Sotomayor, let me ask you this. Is there a disputed issue of fact regarding the level of threat posed by Mr. Saccoccio? No. There is no dispute that individuals had been breaking into homes in the area. In terms of Mr. Saccoccio, was there a dispute of fact? Didn't he say that he — there was — he did not pose a threat? Well, right. And anyone's going to say they don't pose a threat. Well, but — But it's what a reasonable officer would believe. He had a backpack on. It was unknown whether he had incendiary devices in there, whether he had a weapon. But we're supposed to take the facts in the light most favorable to the plaintiff. Right. Well, and Officer Gomez acknowledges that he didn't know whether he had a weapon, and he didn't necessarily — He didn't know if he was going to pose any threat to the people that — where he was — An officer would never know that with 100 percent certainty. It's what is — based on the totality of the circumstances that the officer has observed over the course of four days, it's what would a reasonable officer — what would every reasonable officer have concluded in their mind and been concerned about? It was reasonable for him to be concerned when you have people — So the organized protest ended at 730. So everybody who was out after 730 were in — were not part of the organized protest. Starting at 8 o'clock, everybody who's out is in violation of the law. So is it your position that there was probable cause to use force against everyone who was out past curfew? If they fled from the police, perhaps, yes. A low level of force, yeah, hands-on. And — and recall, Officer Gomez had to make a split-second decision as to what he did in this situation. He was out with six occupants of a vehicle who had not yet been searched. They had no — they had — it had been reported by the air unit that they were assisting rioters, and so he's dealing with those six occupants and gets a sudden alert from the air unit that these people are running toward them, and then he turns, and at the moment, Officer Tate is yelling for Mr. Saccoccio to stop. Mr. Saccoccio does not stop, and — But he doesn't come toward them, does he? No. He tries — he attempts to scale the wall, which he admits in his complaint. So he alleges in paragraph 74 — I'm sorry, 72 of his Third Amendment complaint in a — that he was attempting to scale the fence. To flee. To flee. Correct. And again, it was reasonable, based on the totality of the circumstances for Officer Gomez to have a concern that if he did not use this level of force, which simply is a pain compliance measure and only causes bruising, as far as he knows, to get him to stop. It's no different than if he had been right there and took him to the ground. It's really not any different from that, as the district court correctly found. And it's telling that throughout this case, Mr. Saccoccio had alleged that he was shot at point-blank range. The reason he made that allegation — and he did it over and over and over again, notwithstanding that he knew Officer Gomez was 100 feet away from him when he shot, because he knew that that was dispositive of his claim. And in the Third Amendment complaint, which was filed two years after the lawsuit was commenced, in paragraph 74, he continues to allege he was shot at point-blank range, because he knew that that was the only way he would be able to state a viable excessive force claim, given the totality of the circumstances that Officer Gomez was dealing with. There is — and one other thing in the Puente case, there's an argument in the briefing about a failure to give a warning, and the Puente court, this court, does away with that argument. That argument was made there, and the court rejected it, saying that the officer had initially shot beanbag rounds at the person's feet, and then they went back and started engaging in their conduct again. That's analogous to our situation. Officer Tate shot beanbag rounds at his — or pepperball rounds — I said beanbag, it was pepperball — pepperball rounds at his feet, telling him to stop repeatedly, and Mr. Sicoccio ignored those commands. And so there was no need to give a warning, and it would have been impossible. By the time he'd given a warning, Mr. Sicoccio would have scaled the wall and done who knows what in a residential structure. Thank you for your time. Thank you, counsel. Thank you. Thank you, Mr. McArdle. Thank you. Towards the end of her argument, my friend on the other side mentioned this issue about Mr. Sicoccio's allegation of point-blank range, suggested that this was a deliberate allegation because Mr. Sicoccio would know that the distance, the 100-foot distance, would actually be determinative of his claim. And I don't disagree. I do think it's determinative of his claim in his favor. The 100-foot distance — and I'll back up and say the misstatements all occurred prior to depositions. They're made in the complaint and in medical complaints before depositions occurred. For the purposes of summary judgment in this appeal, it's undisputed that this shooting happened from 100 feet away. And that's important because from 100 feet away, the risk of injury is significantly increased. The accuracy of this weapon is significantly decreased. In the Ninth Circuit's decision in Dwerlleby, Rutherford, at Note 19 — I just want to direct the Court to a particular quote where the Ninth Circuit held that regardless — or noted — that regardless of how we classify particular types of force, the evidence in the record before us makes clear that the force used by Rutherford is quite capable of causing serious injury to the person shot. Accordingly, quote-unquote, deadly or not, such force may not be used except when a strong governmental interest warrants its use and then only following a warning if feasible. The question is not whether this injury or this weapon system was likely to cause serious injury, it's whether it was capable of causing a serious injury and whether a reasonable officer would know that. The weapons manufacturer notes it, the training notes it, and it did cause a serious injury. Under Dwerlle, that is sufficient to elevate this beyond the minimal amount of force that might be appropriate for someone who is fleeing following commission of a misdemeanor curfew violation. This notion of it not being disputed that Officer Gomez was acting in protection of the homeowners is simply false. It's hotly disputed. We have Officer Gomez's testimony, apparently some radio transmission about people possibly getting into a home or trying to get into a home, but Officer Gomez's testimony was not specific to that radio transmission. Officer Gomez testified about hearing a Homeland Security briefing that somewhere in the country protesters were trying to rape in and trying to break into homes and sexually assault people. That's a question for the jury. Is that belief reasonable? What is the source of that belief? What's the corroboration for it? It's not a determination that should be made under Rule 56 by the district court. Finally, we have this issue of what exactly Mr. Seccosio was doing when he was shot. And there is a factual dispute about this. It's undisputed that Mr. Seccosio was trying to scale offense to not be, potentially not be arrested, potentially not be assaulted by police. It's also undisputed that Mr. Seccosio was shot on the outside of his forearm. And if you look at the video of the body cam, we see this is not a 10-foot-tall wall. It's a residential fence. So if he's shot on the outside of his forearm, either his hands are up with his back facing the officer or his hands are down with his front facing the officer. It's the only way the injury could happen. That right there is a factual dispute as to what exactly Mr. Seccosio was doing. Was he attempting to scale a wall to run away? Had he already given himself up after being shot with pepper balls at the ground, seconds passing? Had he put his arms in the air? That all dictates the reasonableness of the use of force that Officer Gomez deployed. At this point, I would just refer the Court one more time to Duerle and the final holding of that case, which is when this level of force is used, intermediate force, it must be supported by a strong governmental interest, and it should be preceded by a warning that the force is coming. We had neither here. Counsel, opposing counsel does not agree that this is intermediate force. What's your best case for the proposition that this force was intermediate? I think the best case for that is the Nelson case, which specifically discusses the force in the context of being significant, and it cites in favor of that proposition the Bryan case, which discusses the use of intermediate force. So when we deal with Nelson, we're talking about pepper balls being significant force, and it cites as its authority an intermediate case. All right. If there's no other questions from the panel, I'll conclude here. Thank you, counsel. Thank you very much. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the Court.
judges: HAWKINS, RAWLINSON, SMITH